UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ADVANCED SOFTWARE DESIGN CORPORATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.  4:07CV185 CDP |
| FEDERAL RESERVE BANK OF ST. LOUIS, et al. | ) ) ) ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER

Advanced Software Design Corporation and its founder, Calin Sandru, have brought suit against Fiserv, Inc. and three Federal Reserve Banks. In their complaint, plaintiffs allege that Fiserv and the banks have infringed on three patents held by Sandru. Defendants have moved to dismiss plaintiffs' claims, or in the alternative for summary judgment – claiming any infringement that might have occurred was done for the United States government and with the government's authorization and consent. Thus, defendants claim that under 28 U.S.C. § 1498 plaintiffs' sole recourse is an action against the United States in the Court of Federal Claims.

Having reviewed the undisputed material facts and the parties' arguments, I conclude that Fiserv and the Federal Reserve banks were acting "for the United

States" within the meaning of § 1498. I will therefore grant summary judgment in favor of the Federal Reserve Banks and Fiserv. Plaintiffs' claims that Fiserv infringed or induced infringement by selling to other banks or customers remains pending.

**<u>Background</u>**

Plaintiffs hold three patents for mechanisms designed to detect check fraud. Plaintiffs' complaint alleges six counts of patent infringement, three against Fiserv and three against the Federal Reserve Banks of St. Louis, Philadelphia, and Atlanta. Plaintiffs allege that Fiserv has marketed an infringing check fraud detection system to the defendant banks, which have in turn implemented the infringing system to aid in the processing of U.S. Treasury checks.[1] Fiserv has filed an answer and counterclaim, denying infringement and seeking a declaration of non-infringement and invalidity with regard to each patent. The defendant banks, together with Fiserv, have moved to dismiss under Rule 12(b)(1) or 12(b)(6), or in the alternative for summary judgment under Rule 56.

The United States has moved to intervene in this case under Rule 24(a)(2) (intervention of right) or in the alternative under Rule 24(b)(2) (permissive

---

[1] Plaintiffs also allege that Fiserv has marketed the allegedly infringing systems to other banks and customers, although this claim is not the subject of the pending motions.

intervention). Together with its motion to intervene, the United States has also filed a motion for summary judgment, seeking dismissal of all claims made against the Federal Reserve Banks.

**Undisputed Facts**

The Fiserv check fraud detection system and the system covered by Advanced Software's patents both work by encoding certain data (e.g., check number, payee, amount, and date) in a seal on the face of a check. The encrypted seal is then decoded and read by the bank as the check is processed. The encrypted data from the seal is compared to the actual figures that appear on the check. Any discrepancy between the encryption and the check figures alerts the bank that the check may be forged or altered. The checks thereby become "self authenticating" and fraudulent checks can be detected much earlier in the processing chain. Because this system requires both an encryption on the check face and a decoding mechanism, both the drawer and the drawee bank must participate to make the fraud detection system work.

Federal Reserve Banks are not government agencies, but rather are private corporations that have commercial banks (called "member banks") acting as shareholders. The Federal Reserve Banks are empowered by statute, however, to be the fiscal depositories for U.S. government funds. The Federal Reserve Banks

in this suit have adopted Fiserv's fraud prevention technology to authenticate checks issued by the U.S. Treasury.

Sometime in 2000, Blake Prichard, a senior vice-president at the Federal Reserve Bank of Philadelphia, became interested in the check-fraud prevention technology then marketed by Signum (later Fiserv).[2] Prichard set up a meeting in late 2000 with Judith Tillman, a Deputy Commissioner at the Financial Management Service (FMS), a bureau of the United States Treasury. Prichard proposed that the Federal Reserve Bank and U.S. Treasury FMS work together to implement Signum's fraud prevention technology. During the spring and summer of 2001, Prichard met with officials from Signum and Fiserv to further develop a proposed plan.

On June 8, 2001, FMS Commissioner Richard Gregg wrote a letter to Prichard officially documenting the Treasury's request for FRB Philadelphia's support in conducting a pilot test of Signum's check fraud prevention program. FMS would develop a plan for printing the encrypted watermark on Treasury checks, while the bank would implement software for decoding and reading the watermarks. Both the encryption and the decryption mechanisms would use

---

[2]According to Plaintiffs' Statement of Material Facts, sometime during the course of the events described here, Fiserv became the exclusive North American distributor of Signum's technology, and eventually bought either the technology or a part of Signum.

technology marketed by Signum/Fiserv.

Eventually, on July 31, 2001, Signum, Fiserv and the Federal Reserve Bank of Philadelphia entered a contract for the pilot program. Although no one at the U.S. Treasury signed the contract, officials at FMS reviewed the contract terms. Specifically, the contract language was changed at the request of FMS to say that the bank was acting "in conjunction with the FMS," rather than "on behalf of the FMS." This contract also specified that Signum would indemnify the Reserve Bank against any claim for patent infringement arising out of the pilot program.

Approximately one year later, on June 28, 2002 Prichard (on behalf of the Federal Reserve Bank of Philadelphia) and officials from Fiserv signed a Master License and Service Agreement for use of the software. Then in August 2003, FMS Commissioner Gregg issued a letter noting the successful completion of the Philadelphia pilot project, and declared FMS's intention to expand the fraud prevention system for use at the Atlanta and St. Louis Federal Reserve Banks. In 2004, the technology caught forged or altered checks worth a total of $3,910,116.60. In 2005, the technology caught fraudulent checks totaling $28,030,749.15. For the first three months of 2006, the figure was $13,532,698.79.

## Legal Standard

Defendants have filed their motion to dismiss under Rules 12(b)(1) and 12(b)(6), and in the alternative as a summary judgment motion under Rule 56. In their motion, defendants argue 28 U.S.C. § 1498 as their sole basis for relief. Under § 1498, if a patented invention is "used or manufactured by or for the United States" without license, the patent holder's only remedy for infringement "shall be by action against the United States in the Court of Federal Claims." In other words, the plaintiff may not sue the private entity or government contractor, but must instead pursue a claim only against the government. Courts have disagreed as to whether § 1498 is a jurisdictional statute or an affirmative defense. *Compare O'Rourke v. Smithsonian Institution Press*, 399 F.3d 113, 123 (2d Cir. 2005) (jurisdictional) *with Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1381 (Fed. Cir. 2002) (affirmative defense). If § 1498 is jurisdictional, defendants should properly style their motion as one to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). If however § 1498 is an affirmative defense, defendants should seek dismissal under Rule 12(b)(6) or summary judgment.

Federal Circuit case law on this issue is clear. As between private parties (such as those in this case), § 1498 is an affirmative defense. *See Toxgon*, 312 F.3d at 1381; *Madey v. Duke University*, 307 F.3d 1351, 1359 (Fed. Cir. 2002);

*Crater Corp. v. Lucent Technologies, Inc.*, 255 F.3d 1361, 1364 (Fed. Cir. 2001). This holding is consistent with the Supreme Court's decision in *Sperry Gyroscope Co. v. Arma Engineering Co.*, 271 U.S. 232, 235-36 (1926). *See Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990) (discussing *Sperry* and holding that for private parties § 1498 is not jurisdictional). Section 1498 is a statute that applies exclusively to patent law. Though courts may be in disagreement over the proper meaning of § 1498, the Federal Circuit provides the governing interpretation. *Madey*, 307 F.3d at 1359. I will therefore apply Federal Circuit precedent and treat the defendants' motion under § 1498 as raising an affirmative defense.

The Federal Circuit in *Toxgon* held that, "if appropriate, a defense arising under § 1498(a) should be resolved by summary judgment under Rule 56 rather than a motion to dismiss under Rule 12." *Toxgon*, 312 F.3d at 1382. In this case, both plaintiffs and defendants have filed affidavits and other evidence outside the pleadings in support of their respective positions. I will therefore treat defendants' motion as one for summary judgment under Rule 56.

The standards for summary judgment are well settled. In ruling on summary judgment, the Court views the facts and inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## **Discussion**

Special limitations apply to patent infringement actions where the alleged infringer is the government or someone working for it:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .
>
> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for

the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

As noted by the Federal Circuit, the statute contains an "awkward circularity." *Sevenson Envtl. Serv. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). Use of a patented invention "for the United States" is defined to include use that occurs (1) "for the Government," and (2) "with the authorization or consent of Government." Fiserv and the Federal Reserve Banks have asserted that the check fraud prevention technology in this case was used "for" the U.S. Treasury, and with Treasury's authorization and consent. Defendants therefore assert that plaintiffs' sole remedy for any patent infringement lies in an action against the United States in the Court of Federal Claims.

Section 1498 acts as both a waiver of sovereign immunity and an assumption of liability on the part of the government. *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949). The statute was intended primarily to "permit the government to purchase goods or services for performance of governmental functions without the threat that the work would not be carried out because its supplier or contractor was enjoined from or feared a suit for infringement of a patent." *Windsurfing Int'l. v. Ostermann*, 534 F. Supp. 581,

587 (S.D.N.Y. 1982). *See also United States v. McCool*, 751 F.2d 1112, 1113 (9th Cir. 1985) (interpreting similar statutory language in § 1498(b), relating to copyright infringement). The statute does not by its terms explicitly require that the government contract for the infringing device. Rather, it merely applies in any case where the invention is used "for" the United States. *Bereslavsky*, 175 F.2d at 150.

As a waiver of sovereign immunity, the statute is to be strictly construed. *Windsurfing*, 534 F. Supp. at 588. However, the Federal Circuit has held that the coverage of § 1498 "should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986). *See also W.L. Gore & Associates v. Garlock, Inc.*, 842 F.2d 1275, 1283 (Fed. Cir. 1988) ("The patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the same.").

### Use "for the government"

Plaintiffs argue that "the government" (in this case, the U.S. Treasury and its Financial Management Service) did not enter into any contract "for" check-fraud prevention technology, and that therefore the government never assumed liability under § 1498, and defendants are not immune from suit. Rather, it was

the Federal Reserve Bank, a private corporation, that entered the contract. As plaintiffs correctly point out, the contract between the Philadelphia bank and Fiserv was even changed to expressly say that the bank was acting "in conjunction with" rather than "on behalf of" the Treasury. The Treasury did not enter into an agreement with Fiserv, and officials from the Treasury did not consider Fiserv to be a government contractor. Furthermore, according to plaintiffs' argument, in practice the new technology was not "for" the government because in the great majority of cases, it was the bank of first deposit (and not the U.S. Treasury) that avoided a loss whenever a fraudulent check was discovered. Though the government no doubt has an interest in ensuring the authenticity of its own checks, plaintiffs argue that the technology was implemented to benefit member banks, not the government.

In essence, the parties set forth two differing interpretations of the phrase "for the government." Plaintiffs argue that for § 1498 to apply, the infringement must be "for the government" in the sense that it takes place at the government's direction and under a government contract. Fiserv and the Federal Reserve Banks argue that "for the government" means that the use must take place in furtherance of government policy and with some benefit accruing to the government. Though there is little case law interpreting this phrase, I find in the circumstances of this

case that the latter of these interpretations is more consistent with the statute's language and purpose.

Where courts have held § 1498 not to apply, it has generally been because the government interest involved was seen as too remote. In *Windsurfing Int'l. v. Ostermann*, 534 F. Supp. 581 (S.D.N.Y. 1982), plaintiffs alleged that the defendant had sold an infringing design for sailboards for use in the 1984 Olympics. While use of the device during the Olympic Games might be "for" the United States in an abstract sense, the court held § 1498 to be inapplicable, because the United States had no direct interest in the particular event. *Id*. at 588. Any interest the United States might have had was "indirect and subsidiary to its interest in the Games generally." Similarly, in *Larson v. United States*, 26 Cl. Ct. 365 (Cl. Ct. 1992), a defendant who had infringed on a patent for a thermoplastic splint was not found to be acting "for the government" merely because Medicare and Medicaid reimbursed the cost of the splints. The medical care at issue was provided "for" the patient, not for the government. *Id.* at 369. Though the government had an interest in the program generally and in seeing that costs were reimbursed, this interest was too remote to come within the ambit of § 1498. *Id. See also Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (off-shore drilling was not done "for the government" merely because the

defendant was paying the federal government a 12.5% royalty in exchange for the rights to drill).

In contrast, courts have found that defendants acted "for the government" in situations where there was a clear government directive with some specific benefit accruing to the government. In *TVI Energy Corp. v. Blane*, 806 F.2d 1057 (Fed. Cir. 1986), the government invited private companies to submit bids for supplying equipment to the military. Plaintiff alleged that the defendant infringed on a patent during a demonstration that was conducted as part of the bidding process. *Id.* at 1059. The court found that the alleged infringement was done "for" the government because the government had specifically required a demonstration of the proposed technology. *Id.* at 1060. Though the government did not explicitly direct the defendant to infringe, and no formal contract existed between the government and the contractor, the only purpose in the demonstration was to comply with a government directive. *Id*. Section 1498 by its terms does not require that there be a government contract mandating infringement. Nor does the existence of a contract necessarily mean that § 1498 automatically applies. *See McMullen v. State Bd. of Higher Educ.*, 406 F.2d 497 (9th Cir. 1969) (limiting its holding to the facts of the particular case and refusing to hold that all government research grants are covered by § 1498). The statute simply requires that what was

done by the private entity be done at the request of and in order to benefit the government. *See Sevenson Envtl. Serv. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1366 (Fed. Cir. 2007) (question whether the infringing practice was "for the government" was answered in the affirmative by the observation that the government sought and received the services at issue).

Here, the Federal Reserve Bank contracted with Fiserv for a technology that was used to verify U.S. Treasury checks. Defendants do not argue (and this Court does not hold) that the Federal Reserve Banks are "government" for purposes of § 1498. *See Scott v. Federal Reserve Bank of Kansas City*, 406 F.3d 532, 536 (8th Cir. 2005) (Federal Reserve Banks are not agencies, departments, commissions, administrations, authorities or bureaus of the federal government). The banks are, however, "instrumentalities" of the government. *Federal Reserve Bank of St. Louis v. Metrocentre Improvement District No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) (citations omitted). As "intimate parts of the government's fiscal structure," the banks are "plainly and predominantly fiscal arms of the federal government. Their interests seem indistinguishable from the sovereign." *Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 278 (3d Cir. 2006); *Federal Reserve Bank of Boston v. Comm'r of Corp. and Taxation of the Commonwealth of Mass.*, 499 F.2d 60, 62 (1st Cir. 1974). By statute, Congress has authorized the Federal

Reserve Banks to act as fiscal agents of the United States and to be depository banks for government revenues. 12 U.S.C. § 391. Where, as in this case, a Federal Reserve Bank enters into a contract for a mechanism designed to catch fraudulent government checks, the logical conclusion is that it does so "for" the government.

Plaintiffs' argument that § 1498 does not apply because the U.S. Treasury FMS never signed a contract is without merit. As discussed previously, the existence of a contract is not dispositive. The U.S. Treasury undoubtedly has a strong interest in seeing that its own checks are authentic. The benefit to the government was not remote or ancillary, as in cases where § 1498 has been held inapplicable. When the Federal Reserve Bank adopted a program for verifying government checks, it did so with the government in mind. In the circumstances of this case, it was not necessary that the bank explicitly act "on behalf of" the Treasury in signing the contract. The benefit of the contract (i.e., the verified authenticity of U.S. government checks) was direct and was "for" the United States. Moreover, by undertaking this verification project, the bank was actually performing a function that had previously been done by the government. The bank was able to authenticate checks upon presentment, whereas before this program, it was the Treasury itself that had to search for check fraud by comparing

actual payouts with records of issued checks. If the banks were now doing work once done by the government, the logical conclusion is that the work was being done for the government.

Plaintiffs further argue that the check fraud detection system was not "for" the government because the actual fiscal benefit in most cases went to the private member banks – the banks where the fraudulent checks were first cashed or deposited. This argument is defeated, however, by the fact that the checks at issue are government checks, drawn on government accounts at Federal Reserve Banks. Whether the U.S. Treasury would incur an actual monetary loss in every case of fraud is irrelevant. The government's concern as to the authenticity of its own checks is a sufficient interest to cause the Federal Reserve Bank (together with Fiserv) to act "for" government.

### With government's "authorization or consent"

Having determined that defendants acted "for the government" within the meaning of § 1498, I now turn to the question of whether defendants acted with the government's "authorization or consent." Section 1498 authorization or consent on the part of the government "may be given in many ways other than by letter or other direct form of communication, . . . [including] by post hoc intervention of the Government in pending infringement litigation against

individual contractors." *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976). A specific contract with the government containing an authorization and consent clause is not required. *Parker Beach Restoration, Inc. v. United States*, 58 Fed. Cl. 126, 132 (Fed. Cl. 2003). Rather, the authorization or consent prong of § 1498 requires "explicit acts or extrinsic evidence sufficient to prove the government's intention to accept liability for a specific act of infringement." *Larson v. United States*, 26 Cl. Ct. 365, 369-70 (Cl. Ct. 1992) (citing *Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 179 (D.C. Cir. 1987)).

Plaintiffs again argue that the government did not authorize or consent to any alleged infringement in this case because no government official signed a contract. As the case law interpreting § 1498 makes clear, a government contract is not required. Officials from the Treasury FMS were aware of the negotiations and agreement between Fiserv and the banks. Treasury consented to the implementation of the fraud prevention technology when it agreed to participate in the program. Fiserv's technology would only detect fraudulent checks if Treasury agreed to print checks with an encrypted seal, and Treasury worked to develop a system for placing that seal on its checks. Officials from Treasury FMS twice sent letters to the Federal Reserve Bank indicating that FMS was willing to proceed with the Fiserv fraud detection technology. Treasury thus unambiguously

communicated that it was consenting to work being done for government benefit. The fact that Treasury was not a party to the contract, or that Fiserv agreed to indemnify the bank against any infringement suit is irrelevant. Neither Fiserv nor the bank are liable for any infringement that took place with the government's consent.

Finally, even if the Treasury FMS's actions before this suit was filed did not constitute § 1498 consent, the government has now consented post hoc by seeking to intervene on defendants' behalf. The United States has moved to intervene under Rule 24, claiming a legitimate interest in seeing that the fraud-prevention mechanism at issue in this case is allowed to continue. Plaintiffs mistakenly argue that there has been no post hoc authorization or consent because in its briefing, the United States has merely reiterated defendants' original arguments as to why the government consented earlier. The arguments contained in the government's brief are irrelevant. The seeking of intervention itself (and not the arguments) unambiguously demonstrates that the government authorizes and consents post hoc to any infringement that may have occurred on the government's behalf.

### Conclusion

The undisputed facts of this case show that Fiserv and the Federal Reserve Banks of Philadelphia, St. Louis and Atlanta acted for the government and with

the government's authorization or consent in implementing a system to verify the authenticity of U.S. government checks. Therefore, under 28 U.S.C. § 1498, a cause of action cannot be maintained by the plaintiffs on this basis in this court.[3]

The defendant banks' motion for summary judgment is granted. Fiserv's motion for summary judgment is granted to the extent that Fiserv has implemented check fraud prevention technology in conjunction with the defendant banks. This Court has not been asked to rule on summary judgment as to claims that Fiserv infringed the patents or induced patent infringement by working with other banks or other customers, so plaintiffs' claims against Fiserv remain to that extent. Fiserv's counterclaims, of course, also remain pending.

This ruling makes the government's motion to intervene and motion for summary judgment moot, and I will deny them as such.

Accordingly,

**IT IS HEREBY ORDERED** that the defendants' motion for summary judgment [#25] is granted. All claims against the defendant banks are dismissed. The claims against defendant Fiserv are dismissed only to the extent that Fiserv sold, used or created computer software or other systems to, for, or on behalf of

---

[3]This Court does not hold (and expresses no opinion on whether) plaintiffs have a cause of action against the United States in the Court of Federal Claims. *See TVI Energy Corp.*, 806 F.2d at 1060-61.

the defendant banks. Plaintiffs' claims against Fiserv based on Fiserv's actions with regard to other banks or customers remain pending.

**IT IS FURTHER ORDERED** that the United States' motion to intervene [#41] and motion for summary judgment [#44] are denied as moot.

This case will be set for a scheduling conference by separate order.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2007.